**WIRE CORPORATION**

v.

**UNITED STATES.**

No. 19–54.

United States Court of Claims.

Oct. 8, 1958.

Alton S. Bradford, Washington, D. C., for plaintiff.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LITTLETON, Judge.

Plaintiff has brought this suit to recover sums alleged to be due it under a contract with defendant acting through the Army Signal Corps. Defendant has counterclaimed for amounts alleged to be due it under the same contract.

In 1950 the Army Signal Corps was interested in obtaining a high production of a new type of telephone cable it had designed and which was of value in the Korean War then in progress. The new cable, known as "spiral-four cable", could carry twelve simultaneous conversations, whereas the type previously used had a capacity of only one conversation in each direction. Contracts for the production and supply of this new cable were entered into by the Signal Corps with six of the major cable producers in the country.

One of the components of the outside covering of the new cable was a woven or braided mesh of stainless steel, non-magnetic wire .015 in diameter. This wire was not produced by the six companies holding prime contracts with the Army, but was in turn obtained by them from subcontractors.

Plaintiff interested itself in producing the .015 steel wire, and by October 1951 had obtained five purchase order subcontracts to produce the wire for cable companies with prime contracts with the Army.

In support of the efforts of the prime contractors to acquire this part of the cable-covering the Army, after making a survey in the industry, entered into what are known as "special facilities contracts" with subcontractors and those who desired to obtain such subcontracts.

A special facilities contract is a contract with the Government wherein equipment and machinery is bought and installed in a plant of a contractor to increase its productive capacity. The machinery is ordered, installed and paid for in the first instance by the contractor. When it has been inspected and approved by the agency and when actual payment by the contractor has been established, the contractor is reimbursed. When the equipment and machinery has been paid for by the Government by way of reimbursement, title to the same passes to and remains in the Government. The equipment and machinery are to be used in connection with the Government work of the particular agency involved and cannot be used for other Government work or for commercial work, unless

there is express written authority to do so.

Following its acquisition of the subcontracts, plaintiff began negotiations with the Army relative to acquiring a special facilities contract. The Army raised two questions with respect to plaintiff's capabilities to produce the wire. The first was the matter of plaintiff's plant which the Army found too small, and the second, concerned plaintiff's financial condition. Plaintiff had applied to the Reconstruction Finance Corporation for a loan, and the RFC, after being assured that a special facilities contract would be given to plaintiff if the loan could be secured, granted a loan in the sum of $75,000. Plaintiff thereupon purchased a new plant, which the Army had recommended as being satisfactory, and vacated its old one. A later loan of $150,000 was secured from the RFC for use as working capital. The first loan was secured by a mortgage on the real estate and the other by a mortgage on plaintiff's equipment, machinery and other personal property.

On February 11, 1952, plaintiff and defendant entered into a contract entitled "Special Facilities Contract" under which certain facilities in the total value of $98,753.92 were to be installed in plaintiff's plant for use in producing the .015 steel wire. By supplemental agreement this amount was later raised to $100,504.19. Plaintiff was one of ten companies to be awarded a special facilities contract with respect to the production of the spiral-four cable.

Plaintiff's experience in producing the wire with which it had had no prior experience was not very successful. In the spring of 1952, despite the availability of raw materials and labor, plaintiff could not meet the delivery dates and quality requirements contained in its subcontracts because of manufacturing difficulties. Although plaintiff by means of trial and error, overcame such manufacturing difficulties and produced wire which met the necessary standards, it never was able to fulfill all its orders for the wire, even during the latter period of its production when the spiral-four cable program was cut back because of the turn of events in the Korean War. Production of 75,000 pounds per month was estimated as needed in order for plaintiff to meet its obligations to the RFC. It never approached that capacity, and despite the RFC loans and the installation of the Government-owned equipment, plaintiff lacked sufficient credit and necessary equipment. The Army subsequently granted plaintiff permission to use the installed machinery and equipment to do commercial as well as other Government work, but by mid-1953 plaintiff's plant was idle because of lack of working funds, although it had a backlog of both Government and commercial orders.

On July 15, 1953, the Army terminated the special facilities contract, and plaintiff was eventually petitioned into bankruptcy by its creditors. After establishing title thereto, the Army removed its machinery and equipment from plaintiff's plant. This suit has been brought by plaintiff in its own name with the knowledge, acquiescence and approval of the trustee in bankruptcy, for the benefit of its creditors and for its own benefit.

After the facilities called for under the contract were installed, plaintiff submitted vouchers to defendant totalling $102,806.78. Of this amount, plaintiff was paid only $94,184.24 leaving unpaid on such vouchers the amount of $8,622.-54. Plaintiff claims that it is entitled to be paid some $27,709.04 for equipment and machinery although its actual recorded expenditures, not all of which are supported by vouchers, totaled only $109,765.32. If such expenditures were incurred in the amount recorded on its books, this would leave a difference of only $15,581.08 between the recorded expenditure of $109,765.32 and the $94,-184.24 already received by plaintiff, and not the $27,709.04 claimed. In addition to the $94,184.08 already paid to plaintiff, the record establishes that only $9,-542 was actually paid out by plaintiff and not reimbursed by defendant, and

of that amount only $8,622.54 was covered by vouchers submitted to the Army.

The Government admits that there is due and owing to plaintiff $5,377.08 of the above $8,622.54. Defendant denies liability for the remaining $3,245.46 on the grounds that as to part of the amount plaintiff has failed to show actual payment to suppliers, and as to the other part of the amount plaintiff failed to render proper billing. For reasons which will be explained hereinafter in connection with our discussion of item one of defendant's counterclaim, we hold that plaintiff is entitled to recover the $3,245.46 as well as the $5,377.08 which defendant admits is due and owing plaintiff.

Under the first item of its counterclaim, defendant says that there is due the Government by plaintiff the sum of $12,818.55 which sum was paid to plaintiff by way of reimbursement on vouchers 1–8 inclusive, in connection with the installation of machinery and equipment. This $12,818.55 is composed of costs the payment of which was later disapproved in the amount of $4,372.20 and was suspended in the amount of $8,446.35, as the result of a reaudit by the Government. In addition, the Army paid nothing to plaintiff on its vouchers 10, 11 and 12 totalling $5,123.80, having suspended payment thereon to the extent of $3,015.95 and having disapproved payment of $229.51, leaving a balance of $1,878.34 which defendant now admits is due to the plaintiff. The $1,878.34 is included in the $5,377.08 discussed earlier herein which total sum defendant admits is due plaintiff. What items go to make up the remainder of the $5,377.08 admittedly due plaintiff is not shown.

The items for which payment was disapproved, i. e., $4,372.20 and $229.51, were so treated because plaintiff had failed to show actual payment, while the items for which payment was suspended by defendant, i. e., $8,446.35 and $3,015.95, were so treated because the items were incorrectly billed.

The machinery and equipment in connection with which the above mentioned suspensions and disapprovals were made, were obtained by plaintiff, installed in the plant and were utilized in the production of the .015 wire under plaintiff's subcontracts. But for the failure of plaintiff to establish actual payment as to some of this machinery and equipment, and its improper billing procedures as to others, plaintiff would have been deemed by the Government to be entitled to be reimbursed for these items. In addition, since the equipment and machinery were required by the contract and were installed and used in plaintiff's plant, defendant, based on the record in this case, must have gained possession of that equipment and machinery when it repossessed the contract facilities upon the termination of plaintiff's contract. An inventory of the equipment and machinery was made by defendant, and a claim with respect to certain items actually found not to have been present upon repossession, is included as item two of defendant's counterclaim and will be discussed hereinafter. Also, with respect to those items for which reimbursement was not made because of improper billing, there is no showing that plaintiff could have purchased the equipment at a lesser cost than it did or that plaintiff paid other than a fair and reasonable price.

In view of the above circumstances, we are of the opinion that defendant is not entitled to recover on item one of its counterclaim. Conversely, plaintiff is entitled to recover the $3,245.46 still due and unpaid on its vouchers 10, 11, and 12. This amount, added to the $5,377.08 which defendant admits is due to plaintiff, totals $8,622.54 due plaintiff as reimbursement for costs incurred in the purchase of the contract facilities.

Plaintiff also claims additional amounts for overhead and direct labor costs with respect to the installation of the equipment and machinery. It contends that the manner in which overhead was to be computed was never agreed upon by the parties, and that there remains due overhead costs in the sum of $12,331.06 (voucher 9). Al-

748

though requested to do so, plaintiff never submitted to the Army, the required accounting statements in support of this amount. In addition, an audit of plaintiff's books and records, affords no basis for the determination of the alleged overhead expenses now claimed. Plaintiff is also in error in contending that no consideration was given to such a cost at the time the contract was made. The Army on February 1, 1952, prior to the execution of the contract on February 11, had prepared a price analysis which contained an estimate for costs likely to be incurred in connection with the installation of the facilities in the amount of $1,440. In view of the small amount involved it was decided to include it as a direct charge, and it was so included in the contract as executed.

Plaintiff lists a claim for unpaid wages in the amount of $6,202.62. While unpaid wages in the amount of $6,101.04 are verified, the evidence fails to establish what part, if any, was for direct labor required for the installation, nor does it show application to or approval by the contracting officer. Plaintiff's auditor testified that the wages were not all for installation but made no attempt to allocate them. The Army estimate of $1,873 for direct labor was included in the contract and paid. Plaintiff is not entitled to recover on these claims.

The remainder of plaintiff's claim is composed of additional items of costs and damages which it contends are due it under the theory that the subject contract was, apart from the provisions relating to the installation of equipment and machinery, a supply contract under which the Government was obligated to insure plaintiff sufficient orders of the .015 wire so that plaintiff's obligation to the RFC could be met.

In support of this theory of recovery, plaintiff points to the reference in the contract to

"Maximum production attained— 1 May 1952 at a maximum rate of 75,000 lbs. per month"

and to the following clauses which appeared in the contract:

"Whereas, there is in existence at this time certain executed supply contract(s) between the Government and the Contractor; and

"Whereas, the successful performance of said contract(s) requires the utilization of Government property and facilities; and

"Whereas, it is deemed by the Department of the Army that the furnishing of said equipment and facilities, itemized in the schedule or schedules attached hereto and amendments thereof, will facilitate performance of said supply contracts and will aid the national defense; * * * *"

The reference to the 75,000 lbs. per month was merely the maximum amount of production which could be expected with the use of the installed facilities called for under the contract.

The contract was prepared on a mimeographed form and it has been found by the trial commissioner, which finding is amply supported by the record, that the above-quoted language is not pertinent and should have been stricken. The executed supply contract(s) referred to in the above-quoted provision were not with this plaintiff. Plaintiff had supply contracts for the production of .015 wire, but they were all with cable companies who had prime contracts with the Army to produce and supply the spiral-four cable which required the use of this wire. The Army had no use for the .015 wire as an end product and never contracted with any company to supply it.

The record establishes that neither party intended the subject contract to be a supply contract either at the time of the execution of the contract or at any time during plaintiff's operations under the contract. Its sole purpose was to enable plaintiff to increase its productive capacity so that it could supply wire in sufficient quantities under the supply contracts it did have with private cable

companies having prime contracts with the Army.

In addition, the record made with respect to the many items of reimbursable costs and damages which plaintiff alleges is due it under the supply contract theory furnishes no basis for recovery by plaintiff for those items. The trial commissioner has found that plaintiff as a matter of proof has failed to substantiate its allegations with respect to these items. They are all found to be either unrelated to plaintiff's production of the .015 wire or not supported by accounting data. These claims are all treated in detail in findings 18–24, 30–32, and 35.

We now turn to the remaining items of defendant's counterclaim, having discussed and denied the first item thereof above.

In item two of its counterclaim defendant asserts that the sum of $2,-907.03 is due it for certain items of installed equipment which were not in the plant when the Army removed the facilities. This amount has been found to be the fair market value of the missing equipment and defendant is entitled to recover that amount.

Item three of the counterclaim is a claim for $6,695 for damage to the machinery and equipment found to be beyond normal wear and tear (finding 39). This damage occurred during the period of approximately six months which elapsed between the time plaintiff ceased operations and the date the Army took possession of the equipment and machinery, and was due principally to the failure of plaintiff to properly store and care for the idle facilities. Plaintiff had been ordered by the trustee in bankruptcy to bear the expense of the maintenance of the plant and machinery and directed to deposit $600 toward defraying this expense, but plaintiff failed to do so. The $6,695 estimate is found to be a reasonable one and defendant is entitled to recover this amount.

As item four of its counterclaim, defendant claims $4,043 as the amount paid for maintaining guards at plaintiff's plant during the period of time between the termination of the contract and the removal of the Government-owned facilities. While under the contract such a cost was one, which, if incurred by plaintiff, would have been reimbursed, the delay in removing the equipment and the consequent necessity for providing the protection-service was occasioned by plaintiff. The Army had sought to remove the equipment immediately upon termination of the contract but plaintiff, by steps taken in the bankruptcy proceedings, prevented the removal for several months. Having chosen to do so, plaintiff must be held to be liable for the cost of whatever reasonable steps were necessary to safeguard the Government equipment in the idle plant. The fair value of the Army's share of this cost, which it shared with the RFC, is found to be $4,043 and defendant is entitled to recover that sum.

In its brief the defendant has asked leave to amend its counterclaim to include an additional item representing Federal employer withholding taxes and Federal old age benefit taxes, together with interest and penalties thereon, which defendant asserts are due to the United States from plaintiff in connection with the performance of the contract in suit and which have not been paid. The plaintiff in turn has claimed in its petition that under its contract it was entitled to be reimbursed by the Government for such taxes. We have been unable to find any provision in the contract which provides for the reimbursement of such taxes to the plaintiff. In urging that the taxes are a reimbursable item under the contract, plaintiff, of necessity, relies on its supply contract theory and alleges that the failure of the Government to allocate shipments of the wire relieves the plaintiff of the necessity of paying the tax. In view of our holding that the contract was a special facilities contract and not a supply contract, it follows that there is no merit to this contention of the plaintiff.

While we do not favor defendant's method of moving in its brief for

leave to amend its counterclaim rather than proceeding by motion filed during the trial stage or after the filing of the trial commissoner's report, its request to amend its counterclaim is granted under Rule 18(b) of the Court, 28 U.S.C.A. We are unable, however, to render judgment for the defendant on this item of its counterclaim in the present state of the record. The sum of $34,816.49 claimed by defendant includes not only the principal amount of the Federal taxes due but also penalties and interest on such taxes and the record does not indicate how much of that total sum represents principal and how much represents penalties and interest. We have held that plaintiff is entitled to recover from the Government certain amounts which were due to it under its contract and upon which amounts no interest is, of course, allowable. Accordingly, we can allow no interest or penalties in favor of the Government on taxes due to the United States by the plaintiff if those taxes accrued during the period when the Government owed the plaintiff the amounts now found to be due plaintiff under the contract in suit. Furthermore, the record does not reveal whether any assessment or demand of the taxes in question were made on the plaintiff and, if so, the dates of such assessment and demand. American Propeller & Mfg. Co. v. United States, 300 U.S. 475, 57 S.Ct. 521, 81 L.Ed. 751.

In summary, we conclude that plaintiff is entitled to recover from the United States the sum of $8,622.54, and that defendant is entitled to recover of the plaintiff $13,645.03. However, we are unable to make a final determination as to the amount of the judgment for the defendant until further proceedings are held pursuant to Rule 38(c). During such further proceedings the defendant will have an opportunity to furnish the court with a statement concerning the principal amount of the taxes due in connection with the contract in suit, the fact of whether or not assessment and demand were made upon the plaintiff, and, if so, the dates of such assessment and demand.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.